Anderson, J.,
delivered the opinion of the court.
By an act of assembly approved April 18,1874 (§ 22,. chap. 214, p. 248, Sess. Acts 1874), “If any person (other than a citizen of this state) shall take or catch oysters, or other shell fish, in any manner, or plant-oysters in the waters thereof,” &e., “he shall forfeit $500 and the vessel, tackle and appurtenances.” This is an indictment against the plaintiff in error, who is other than a citizen of this state, for planting oysters in the waters thereof, to wit: in Ware river, in violation of said 22nd section.
The prosecution is resisted upon the ground that the above section is an infringement of the constitution of the United States; because it is contrary, first, to article 4, section 2, “The citizens of each state shall be entitled to all privileges and immunities of citizens of the several states;” and second, to article 1, section 8, “The congress shall have power to regulate commerce with foreign nations and among the-several states,” &c.
It seems to be well settled, that the states respectively, are entitled to the navigable waters within their *987 several territorial limits, including both the water and the land under the water. In Martin v. Waddell, 16 Peters R.. 367, 407, Ch. J. Taney, speaking for a jority of the court, says, “We do not propose to med-die with the point, as to the power of the king since Magna, Charta, to grant to a subject a portion of the soil covered by the navigable waters of the kingdom; for when the revolution took place the people of each state became themselves sovereign, and in that character hold the absolute right to all their navigable waters and the soils under them, for their own common use;” as expressed by Oh. J. Kirkpatrick, of the supreme court of New Jersey, “The people of the state since the revolution being invested with the regal rights as sovereign, and having themselves both the legal estate and the usufruct, may make' such disposition of them, and such regulations concerning them, as they may think fit;” “subject only,” Oh. J. Taney adds, “ to the rights since surrendered by the constitution to the general government.” We will after a while consider what they are.
In Smith v. State of Maryland, 18 How. U. S. R. 71, it was held by the supreme court of the United States, Mr. Justice Curtis delivering the opinion, that whatever soil below low-water mark is the subject of exclusive property and ownership, belongs to the state on whose maritime border and within whose territory it lies, subject to any lawful grants of that soil by the state, or the sovereign power which governed its territory before the declaration of independence.” He goes on further to say: “The state holds the property of the soil in some sense in trust for the enjoyment of. the public rights, among which is the common liberty of taking fish, as well shell fish as floating fish, and may regulate the modes of enjoyment, so that they may not. *988 render the public property less valuable, or destroy it altogether.” “Andthis power (he says) results from ownership of the soil, the legislative jurisdiction of state over it, and from its duty to preserve those public uses for which the soil is held.” Among those public uses is the right of the people of the state to take and plant oysters subject to the regulations of law. Chief Justice Marshall says, speaking for the court, in Johnson v. McIntosh, 8 Wheat. R. 543, 584: By the treaty which concluded the war of our revolution, the powers of government and the right to soil, which had previously been in Great Britain, passed definitively to these states. Great Britain by that treaty relinquished all claim, not only to the government, but to the proprietary and territorial rights of the United States.
Chief Justice Taney, 16 Peters, supra, p. 416, says: “When the people of New Jersey took possession of the reins of government, and took in their own hands the powers of sovereignty, the prerogatives and regalities which before belonged either to the crown or the parliament became immediately and rightfully vested in the state.” In the City of Mobile v. Eslava, 16 Peters R. 234, 254, Mr. Justice Catron said: “ That the original states acquired by the revolution the entire rights of soil and of sovereignty in the navigable waters within their territory is most certain.” And “ that -each and all of the states have sovereign power over their navigable waters above and below the tide ho one doubts.” (P. 259.)
Mr. Justice Washington said, in Corfield v. Coryell, 5 Wash. C. C. R. 381, a several fishery, either as the right to it .respects running fish, or such as are stationary, such as oysters, clams, and the like, is as much the property of the individual to whom it belongs, as dry *989 land or land covered by water, and is equally protected by the laws of the state against the aggressions of others, whether citizens or strangers. Where private rights do not exist to the exclusion of the common right, that of fishing belongs to all the citizens or subjects of the state. It is the property of all, to be enjoyed by them in subordination to the laws which regulate its use. They may be considered as tenants in common of this property, and they are so exclusively entitled to the use of it, that it cannot be enjoyed by others without the tacit consent or the express permission of the sovereign, who has the power to regulate its use. Grotius says (b. 2, ch. 2, sec. 5), the sovereign who has dominion over the land or waters in which the fish are, may prohibit foreigners from taking them.
It is the right to the use of land covered with water that is in question here, rather than the water which covers it—of land which may be applied to the planting and growing of oysters, and which may be used for that purpose, just as other lands are used for the purposes for which they are peculiarly adapted. ■ The lands which may be used for the purpose of growing and cultivating oysters, as well as those upon which are her natural oyster beds, which underly her navigable waters, Virginia claims not only sovereignty over, but also an ownership in the soil. If the state has the ownership in the soil, and the sovereign dominion over it, unquestionably she had the right to prohibit the deposit or planting of oysters upon it, or the use of it for any purpose, by non-residents or others than citizens of the state.
There seems to have been some diversity of opinion amongst learned judges upon the question, whether the title to the soil, covered by the navigable waters of *990 the state, became absolutely vested by the revolution in the state, or only in trust for the benefit of the péoof the state. It is a question of no importance, as far ag this case is concerned, whether the people of Virginia were clothed with the legal title to the lands and waters in question, or only had a. beneficial interest in them or right to their enjoyment. Have the people of Virginia a proprietary right in common in the soil flowed or covered by the navigable waters of the state? It matters not whether the soil under the navigable waters of Virginia, on which any person other than a citizen of Virginia is prohibited from planting oysters by the act of assembly in question, is the absolute property of the state of Virginia, or whether it is held by the government in trust for the people of the state, who, in common, have an exclusive right to its enjoyment. It is a property in the enjoyment of which the people of other states have not a right to participate, unless the people of Virginia have conceded to them the right in the federal constitution.
From what has been said, it will appear that the people of each state had title to their navigable waters and to the soil under them, which was exclusive of the people of the other states and all others. Have the states parted with their sovereignty over, and their property in these waters and the soils under them ? Or have the people of each state covenanted and agreed by that solemn compact that the people of other •states shall participate with them or become tenants in common with them in the ownership and enjoyment of their navigable waters and the soils under them ? It is true, as claimed by the learned counsel in argument, that Virginia subscribed that solemn instrument, and that she ought to be willing to abide her solemn act. There is nothing in her past history that can cause *991 ■distrust in her devotion to the principles of that sacred instrument, and never through our instrumentality can those solemn pledges be falsified. The states be benefitted by withholding from the central government any part of the power fairly delegated to it by •the states in the federal constitution. Uor will it promote the welfare of the United States for the government thereof to encroach upon and to absorb the reserved rights of the states. Uothing would more surely in our opinion overthrow the republic and be destructive of the public liberty.
It is denied that Virginia has by any provision in the constitution,- expressly or impliedly, surrendered her sovereign dominion over, or her ownership in her navigable waters and the soil under them, except only to the extent that it may be necessary to enable eon.gress to execute the power and discharge the duty created or delegated by article 1, section 8, of the constitution, “to regulate commerce with foreign nations and among the several states.” This clause has been •construed to invest congress with a controlling power over the subject of navigation. And hence it follows that the states are so far restricted in the exercise of their reserved powers over their navigable waters, and in the use and enjoyment of their property in them, and in the soil under them, so as not to impede, obstruct, or interfere with navigation.
As was said by Mr. Justice Thompson in Martin v. Waddell, supra, “For the purpose of navigation, the water is considered a public highway to all; like a public highway on land. If land over which a public highway passes is conveyed, the soil passes subject to that use. So with respect to the land under water; the public use for passing and repassing, and all the purposes for which a public way may be used are open *992 to the public; the owner retaining nevertheless all the- . -i-i rights ana benefits of the soil that may not impede or-with the use as a public highway. Should a coal mine, for instance, be found under the highway, it would belong to the owner of the soil, and might be used for his benefit, preserving unimpaired the public highway. So with respect to an oyster bed, which is. local and attached to the soil. But the use of the soil by the owner, which is consistent with the use of the-water by the public, is reserved to the owner.” The-power to control or regulate navigation is not given as an express or substantive power; it is only incidental to, or resulting from the express power “ to regulate comm'erce;” and can only be used and exerted so far as it is necessary and proper to enable congress “ to regulate- commerce with foreign nations and among the several states.” And the sovereignty of the several states over, and ownership in'their respective navigable waters and the soil under them is restricted only by the power which congress may exercise on the subject of navigation. And consequently their property in the oyster beds, and the soil under their navigable waters respectively, and their power to regulate and control the taking and catching oysters, and the planting of them on the soil which belongs to them respectively, is plenary and perfect, inasmuch as the full enjoyment of the right, and the exercise of the power, cannot interfere with the subject of navigation, nor with the power of congress to regulate commerce. The conclusion is -therefore necessary that the act of assembly in question, is not incompatible with, and in violation of section 8, art. 1, of the federal constitution.
Is it incompatible with art. 4, and section 2? Did the people of Virginia in adopting the constitution, agree that the people of the other states should be *993 come joint owners with them of their oyster beds, and their navigable waters, and of the soil covered by them? And is this title conferred on the citizens other states by the declaration, that “the citizens each state shall be entitled to all privileges and immunities of citizens of the several states?” We think not. We have shown that this is a right of property, and we do not think that the clause in question was intended to transfer the rights of property of the citizens of one state to the citizens of the other states. In Corfield v. Coryell, Mr. Justice Washington says, (4 Wash. C. C. R. p. 382,) “That this exclusive right of taking oysters in the waters of New Jersey has never been ceded by that state, in express terms, to the United States, is admitted by the counsel for the plaintiff'; (and we have, we think, shown that it has not been ceded by any of the states;) and (Judge Washington proceeds) having shown as we think we have, that this right is a right of property, vested either in certain individuals, or in the state, for the use of the citizens thereof; it would, in our opinion, be going quite too far (and we are of the same opinion) to construe the grant of privileges and immunities of citizens, as amounting to a grant of a cotenancy in the common property of the state, to the citizens of all the other states.”
What is meant by the privileges and immunities of citizens? Does it mean rights of property? An estate in the lands of the country—whether dry lands or those covered with water? The same eminent judge says, “We feel no hesitation in confining these expressions to those privileges and immunities which are in their nature fundamental.”' He proceeds then to explain what he means by fundamental privileges and immunities. He says such as “ belong of right to the citizens of all free governments, and which have, *994 at all times, been enjoyed by the citizens of the sev eral states which compose this union, from the time of their becoming free, independent and sovereign.” And he says, they may “be all comprehended under the following general heads: protection by the government; the enjoyment of life and liberty; the right to acquire and possess property of every kind, and to pursue happiness and safety.” These are fundamental rights, and the citizens of any one of the states, by this clause of the constitution, are guaranteed the same privileges and immunities for their enjoyment in any other state that the citizens of that state enjoy. Whilst it guarantees to the citizen, of one state the right to acquire and possess property of any kind in any other state, it does not give him the right to seize and hold the property belonging to the citizens of that other state, or to share with them in the enjoyment of property which belonged exclusively to them. Therefore, this eminent jurist justly says, “we cannot accede to the proposition which was insisted on by the counsel, that, under this provision of the constitution, the citizens of the several states are permitted to participate in all the rights which belong exclusively to the citizens of any other particular state, merely upon the ground that they are enjoyed by those citizens; much less, that in regulating the use of the common property of the citizens of such state, the •legislature is bound to extend to the citizens of all the other states the same advantages as are secured to their own citizens.” Again he says, “we hold that the power to regulate the fisheries belonged to the several states, and to punish those who should transgress those regulations was exclusively vested in those states respectively, at the time when the present constitution was adopted.” And he adds that that power *995 u was not surrendered to the United States, by the mere grant of admiralty and maritime jurisdiction, to •the judicial branch of the government.” And in course of his opinion he holds, it was not surrendered •at all.
If this opinion can be relied on as settling the law of the subject we think it is decisive of this case. It is true that it is not binding authority upon this court. But when we consider by whom the opinion was delivered, an eminent judge of the supreme court of the United States, who was cotemporary and intimately associated with those who framed the constitution, and its cotemporaneous expounders who were familiar with the prerogatives and powers of the states before the adoption of the federal constitution, and when we consider the time when the opinion was pronounced, so soon after the constitution was adopted, in connection with the surrounding circumstances, it may be regarded as itself a cotemporaneous exposition of the constitution. And when we consider the intrinsic merit of the opinion, the support which its positions derive from reason and authority, and the reasonableness of its deductions, its repeated recognition as authority by the courts, state and federal, nisi prius and supreme, and the acquiescence of the country now for more than half a century in its doctrines, and the legislation of the states being in conformity thereto, we are disposed to regard it as authoritative, and as settling the law of the subject, especially as its exposition of the law js in conformity with our own views of what the law is.
Upon the whole, we are of opinion that the act of assembly, under which this indictment was found, is not an infringement of the constitution of the United •States or of any of its provisions.
*996 The errors assigned, of a formal and technical character, in the petition to the circuit court for a writ of error, do not seem to have been relied on here, and are considered by the court as not showing ground for reversal. The judgment of the circuit court, affirming the judgment of the county court, must therefore b& affirmed with costs.
Judgment aeeirmed.